JS 44   (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Colonial School District

**(b)** County of Residence of First Listed Plaintiff   Montgomery
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Karl A. Romberger, Jr., Esquire-Sweet, Stevens, Katz & Williams LLP
331 E. Butler Avenue, P.O. Box 5069, New Britain, PA  18901
(215) 345-9111

## DEFENDANTS

E.G., by and through his parents, M.G. and J.G., and M.G. and J.G., individually

County of Residence of First Listed Defendant   Montgomery
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
Catherine M. Reisman, Esquire-Reisman Carolla Gran & Zuba LLP
19 Chestnut Street, Haddonfield, NJ  08033
(856) 354-0071

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

### CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

### TORTS
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### FORFEITURE/PENALTY
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

### LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### CIVIL RIGHTS
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☒ 448 Education

### PRISONER PETITIONS
**Habeas Corpus:**
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty
**Other:**
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

### IMMIGRATION
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
IDEA of 2004, P.L. 108-446, 118 Stat. 2647-2808 (Dec. 3, 2004), 20 U.S.C. Sections 1401-1482
Brief description of cause:
Appeal from an administrative decision dated December 21, 2018

## VII. REQUESTED IN COMPLAINT:

- ☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE
3/19/19

SIGNATURE OF ATTORNEY OF RECORD

## FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ 230 Flourtown Road, Plymouth Meeting, PA  19462 _____

Address of Defendant: _____ 41 Vibrunum Court, Lafayette Hill, PA  19444 _____

Place of Accident, Incident or Transaction: _____

---

*RELATED CASE, IF ANY:*

Case Number: _____    Judge: _____    Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1.  Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?  Yes ☐  No ☑

2.  Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?  Yes ☐  No ☑

3.  Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?  Yes ☐  No ☑

4.  Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?  Yes ☐  No ☑

I certify that, to my knowledge, the within case ☐ is / ☑ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: __3/19/19__    _[signature]_    __60636__
                      *Attorney-at-Law / Pro Se Plaintiff*       *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.**    *Federal Question Cases:*                         **B.**    *Diversity Jurisdiction Cases:*

☐  1.  Indemnity Contract, Marine Contract, and All Other Contracts        ☐  1.  Insurance Contract and Other Contracts
☐  2.  FELA                                                                  ☐  2.  Airplane Personal Injury
☐  3.  Jones Act-Personal Injury                                             ☐  3.  Assault, Defamation
☐  4.  Antitrust                                                             ☐  4.  Marine Personal Injury
☐  5.  Patent                                                                ☐  5.  Motor Vehicle Personal Injury
☐  6.  Labor-Management Relations                                            ☐  6.  Other Personal Injury *(Please specify):* _____
☑  7.  Civil Rights                                                          ☐  7.  Products Liability
☐  8.  Habeas Corpus                                                         ☐  8.  Products Liability – Asbestos
☐  9.  Securities Act(s) Cases                                               ☐  9.  All other Diversity Cases
☐  10. Social Security Review Cases                                              *(Please specify):* _____
☐  11. All other Federal Question Cases
    *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, ___ Karl A. Romberger, Jr. ___, counsel of record *or* pro se plaintiff, do hereby certify:

☐  Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☑  Relief other than monetary damages is sought.

DATE: __3/19/19__    _[signature]_    __60636__
                      *Attorney-at-Law / Pro Se Plaintiff*       *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

| | | |
|---|---|---|
| Colonial School District | : | CIVIL ACTION |
| v. | : | |
| E.G., by and through his parents, | : | |
| M.G. and J.G., and M.G. and J.G., | : | NO. |
| individually | : | |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                    ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
     and Human Services denying plaintiff Social Security Benefits.                                   ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
     exposure to asbestos.                                                                              ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
     commonly referred to as complex and that need special or intense management by
     the court.  (See reverse side of this form for a detailed explanation of special
     management cases.)                                                                                ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.               (XX)

| | | |
|---|---|---|
| 3/19/19 | | Colonial School District |
| **Date** | **Attorney-at-law** | **Attorney for** |
| (215)345-9111 | (215) 348-1147 | kromberger@sweetstevens.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **COLONIAL SCHOOL DISTRICT,** : | **Civil Action** |
| 230 Flourtown Road : | |
| Plymouth Meeting : | **No. _____** |
| Montgomery County, Pennsylvania : | |
| : | |
| **Plaintiff** : | |
| : | |
| **v.** : | |
| : | |
| **E.G., by and through his parents,** : | |
| **M.G. and J.G., and M.G. and J.G.,** : | |
| **individually,** : | |
| Montgomery County, Pennsylvania : | |
| : | |
| **Defendants.** : | |

## COMPLAINT

1.      Plaintiff is the Colonial School District, a Pennsylvania public school district and local educational agency under the IDEA,[1] with offices located at 230 Flourtown Road, Plymouth Meeting, Pennsylvania 19462.

2.      Defendant, E.G., is a minor student whose parents reside within the Colonial School District.

3.      Defendants, M.G. and J.G. ("parents"), are minor student's parents and reside within the School District's boundaries.

---

[1].      The Individuals with Disabilities Education Improvement Act of 2004 ("IDEA"), P.L. 108-446, 118 Stat. 2647-2808 (Dec. 3, 2004), 20 U.S.C. §§ 1401-1482.

4.    This court has federal question jurisdiction, 28. U.S.C. § 1331, and specific grant of jurisdiction under Section 615(a) of the IDEA, 20 U.S.C. § 1415(i)(2).

5.    Venue properly lies in the Eastern District under 28 U.S.C. § 1391, as the parties reside, and the causes of action arose, within this District.

6.    The Colonial School District has exhausted the claims in this Complaint through a final administrative decision dated December 21, 2018.  A redacted copy of the hearing officer's final Decision and Order ("H.O. Dec.") is attached as "Exhibit A."

7.    Colonial School District seeks to reverse the hearing officer's Decision and Order, which determined that Colonial School District failed to provide a free appropriate public education ("FAPE") to E.G., and ordered Colonial School District to reimburse his parents for the costs associated with E.G.'s unilateral parental placement at Waterfall Canyon, a residential treatment facility in Utah.

8.    E.G. is a disabled student identified under the primary educational disability category of Autism, 34 C.F.R § 300.8(c)(1) (defining Autism) with a secondary category of Emotional Disturbance, 34 C.F.R. § 300.8(c)(4) (defining Emotional Disturbance), and, who by reason thereof, needs special education and

related services pursuant to the IDEA, 20 U.S.C. § 1401(3)(A) (defining child with a disability); 34 C.F.R. § 300.8(a)(1) (same).

9.    Since 2015 and through the present, parents have unilaterally placed E.G. in multiple out-of-state residential treatment facilities, each one an abysmal failure.

10.    During most of this time, the parties' relationship was governed by a settlement agreement, extended twice after parent demand, requiring Colonial School District to contribute funds but having no other obligation or responsibility for any of the serial residential treatment facilities placements.

11.    Pursuant to the last extended settlement agreement, Colonial School District reevaluated E.G.

12.    During the reevaluation process, parents sought yet another extension to the settlement agreement.

13.    Colonial School District declined to extend the settlement agreement and sought to provide an educational program and placement reasonably calculated to address E.G.'s unique educational needs.

14.    Parents sued in response.

3

15.    The Office for Dispute Resolution, the Commonwealth's designated agent for coordinating special education hearings,[2] docketed the action as ODR No. 21067 – 18 – 19 KE, and assigned Hearing Officer Brian J. Ford, Esquire.

16.    Evidentiary hearings occurred on September 24, November 13 and 20, 2018, with a final Decision and Order sent on the evening of December 21, 2018.

17.    Colonial School District is a party aggrieved by the hearing officer's final Decision and Order and timely brings this action pursuant to Section 615(i)(2), 20 U.S.C. § 1415(i)(2).

18.    The hearing officer erred by: (Count I) failing to require that parents exhaust remedies available through other public agencies to address E.G.'s mental and behavioral health needs; (Count II) ordering reimbursement for non-educational residential treatment; (Count III) finding Colonial School District did not offer a FAPE; (Count IV) finding that Waterfall Canyon is appropriate for reimbursement; (Count V) deciding the equities support reimbursement to parents; and (Count VI) making cumulative and compounding errors rendering his decision not worthy of deference.

19.    Colonial School District's allegations in this Complaint relating to the hearing officer's errors are neither exhaustive, but examples, nor exclusive, but often overlapping.

---

[2]    20 Pa. Code § 14.162(p).

## Count I:  IDEA Exhaustion and Payor of Law Resort.

20.    Colonial School District incorporates the allegations above in Paragraphs 1 through 19 as if set forth at length.

21.    Colonial School District has the unambiguous statutory right to be the payor of last resort.  When any other public agency is "obligated under Federal or State law, or assigned responsibility under State policy . . . , to provide or pay for any services that are also considered special education or related services . . . that are necessary for ensuring a free appropriate public education to children with disabilities within the State, such public agency shall fulfill that obligation or responsibility, either directly or through contract. . . ." 20 U.S.C. § 1412(a)(12)(B)(i).

22.    Parents are the only ones in a position to enforce E.G.'s rights against any other "such public agency."

23.    Whether by statute, by equity, 1415 U.S.C. § 1412(10)(C)(iii)(III) ("unreasonableness"), by "assuming the financial risk" of unilateral parental placements, *see, inter alia., Florence County Sch. Dist. v. Carter*, 510 U.S. 7 (1993); *School Comm. of Burlington v. Department of Educ.*, 471 U.S. 359 (1985), or some other rule, parents must first exhaust the processes the Commonwealth of Pennsylvania makes available to them to determine E.G.'s medical, behavioral, and mental health needs, services, and supports before suing Colonial School

5

District for the costs associated with their unilateral placement of E.G. in a residential treatment facility.

24.    E.G. qualifies for Medical Access, N.T. at 240:8-10 (mother), and, as such, for behavioral health and rehabilitative services ("BHRS"), through the Montgomery County Office of Behavioral and Rehabilitative Services ("BHRS agency"), and ultimately under the purview of the State Department of Public Welfare.

25.    E.G. previously received behavioral and mental health treatment supports and services through the BHRS agency in his home years ago but parents ended the supports and services because "[they] weren't seeing any improvement of any benefit to it at all." N.T. at 239:14-15 (mother).

26.    E.G. is able to live at home, H.O. Dec. at 4 of 14 FF 13, but unfortunately his parents have not availed themselves, and allowed E.G. the benefit, of available BHRS agency behavioral and mental health treatment services, supports, and training.

27.    E.G. has a continuing need for BHRS services or a higher level of care in a residential treatment facility ("RTF") to address his medical, behavioral, and mental health treatment needs.

28.    Parents have not sought a meeting, evaluation, or intake with the BHRS agency to obtain a determination of E.G.'s need for medical, behavioral,

and mental health supports and services, including possible RTF placement. N.T. at 240:14-21 (mother).

29.    Parents did not prove that all other § 1412(a)(12) public agencies refused to provide E.G. with needed medical, behavioral, and mental health treatment, services, supports, or funding.

30.    By choosing not to pursue other § 1412(a)(12) public agency medical, behavioral, and mental health treatment options, parents have prevented any other § 1412(a)(12) public agency from determining E.G.'s treatment and service needs, prevented the operation of IDEA's interagency requirements, and frustrated Congress' purposes to rationalize funding and assure funding and services through proper agencies.

31.    Parents have effected an end-around Pennsylvania's interagency process and the IDEA by failing to obtain a determination of and to exhaust available medical, behavioral, and mental health treatment and services through Medical Access, the BHRS agency, and any other § 1412(a)(12) public agency.

32.    Colonial School District is not obligated to pick up both the task of, and the tab for, E.G.'s medical, behavioral, and mental health treatment needs. *See Munir v. Pottsville Area Sch. Dist.*, 723 F.3d 423, 430 n.6 (3d Cir. 2013) ("if a school district would not have been required to provide the child with residential treatment before the child was withdrawn from public school, it does not become

7

financially responsible for that placement when parents make the unilateral decision to enroll their child at a residential facility.").

33.    The hearing officer ruling violates Colonial School District's unambiguous federal right to not pay for or provide medical, behavioral, and mental health treatment services, wrongfully shifts to Colonial School District the consequence of parents' election to not pursue other § 1412(a)(12) public agency supports and services,  and violates federal and state law and policy to provide medical, behavioral, and mental health treatment and services through the public agencies with appropriate expertise.

## Count II:  Residential Treatment.

34.    Colonial School District incorporates the allegations above in Paragraphs 1 through 33 as if set forth at length.

35.    The hearing officer correctly found that Waterfall Canyon is a residential treatment facility.    H.O. Dec. at 11 of 14 ("a community-based therapeutic residential treatment center").    *See also* N.T. at 419:23 – 420:4 (Nickel[3], describing residential treatment center); N.T. at 432:1-4 (Nickel, "we're a licensed residential treatment center"); (N.T. at 682:25 – 683:2 (Richter[4], "licensed as a residential treatment center"); https://waterfallcanyon.com/  ("community

---

[3]      Karen Nickel, M.S., Residential Program Director for Waterfall Canyon.  N.T. at 379:5 – 3870:5.

[4]      Ryan Richter, M.S., LCMHC, Clinical Director for Waterfall Canyon.  P-100.

based licensed residential treatment center") (last accessed Feb. 25, 2019), and

http://waterfallcanyon.com/wp-content/uploads/2015/05/Website-Printable.pdf

("community based therapeutic program) (last accessed Feb. 25, 2019).  But the

hearing officer's application of the finding is in error.

36.    As the name implies, the RTF placement at Waterfall Canyon is not

primarily for the purposes of education but, instead, is to treat medical, behavioral,

or mental health needs.

37.    That E.G.'s unilateral parental placement at Waterfall Canyon is

primarily for the purposes of medical, behavioral, or mental health treatment, with

education being ancillary, is confirmed by the laws in Utah, where the RTF is

located.

38.    A Utah RTF is a "human services program" licensed by, and under

the supervision of, the Utah Department of Human Services.  Utah Code 62A-2-

101(23)(a).  *See also* Utah Admin. Code R501-19-1 *et. seq*.; N.T. at 419:11-15

(Nickel).

39.    Utah law defines "[r]esidential treatment" as "a 24-hour group living

environment for four or more individuals unrelated to the owner or provider that

offers room or board and specialized treatment, behavior modification,

rehabilitation, discipline, emotional growth, or habilitation services for persons

with emotional, psychological, developmental, or behavioral dysfunctions,

9

impairments, or chemical dependencies." Utah Code 62A-2-101(36)(a). *See also* Utah Admin. Code R501-19 (Residential Treatment Programs).

40.     Utah regulations add that an RTF is staffed with a physician, a licensed psychologist, licensed mental health therapists[5], etc., Utah Admin. Code R501-19-5, and must follow a treatment plan signed by a clinical supervisor, Utah Admin. Code R501-19-6.

41.     Utah law expressly states that an RTF does not include a "boarding school." Utah Code 62A-2-101(36)(b).

42.     A "boarding school" is, rather, a private school offering a residence "for the purpose of enabling the school's students to attend classes at the school; and as an ancillary service to educating the students at the school; (iii) has the primary purpose of providing the school's students with an education, . . . ." Utah Code 62A-2-101(4)(a).

43.     Unlike an RTF, which is a "human services program" licensed by, and under the supervision of, the Utah Department of Human Services, a special education program is under the "control and supervision" of the Utah State Board of Education, Utah Code 53E-7-202(3), a power confirmed in the State Board's regulations, Utah Admin. Code R277-426-1.

_____

[5]     *See* Utah Code 58-60-102, defining "mental health therapist."

44.    As a matter of law, Waterfall Canyon is not an educational placement that qualifies for reimbursement under the IDEA.

45.    As a matter of fact, the administrative record confirms that E.G.'s placement at Waterfall Canyon is not an educational placement that qualifies from reimbursement under the IDEA, but is instead placement in an RTF primarily to treat his medical, behavioral, or mental health treatment needs.

46.    Notably, E.G. cannot leave Waterfall Canyon and cannot even return home without approval through his treatment team, *see* N.T. at 611:18-24 (Kodman-Jones[6]); N.T. at 685:24 – 686:4 (Park[7]), a power that an educational entity simply does not possess.

47.    Waterfall Canyon provides E.G. with "intensive, around-the-clock supports with a focus on independent living skills, and therapies to decrease [E.G.'s] rigidity.  Treatment at [the RTF] initially focused on [E.G.'s] medication compliance, urinary frequency (an escape behavior), sleep schedule, and general compliance." H.O. Dec. at 5 of 14 FF 23.

48.    E.G.'s treatment at Waterfall Canyon includes goals for, among others: daily group therapies (anger management / aggression replacement, accountability, compliance, following program rules, character development);

---

[6]    Dr. Christine Kodman-Jones, a Pennsylvania school and clinical psychologist, retained by parents. P-97.
[7]    Dr. Brandon Park, a Utah licensed psychologist, retained by parents. P-43 at 35 of 46.

family therapy; individual therapy (rigidity, emotional regulation, anxiety, coping skills, family relationships); social skills; daily living skills; and medication management. *See, among others,* N.T. at 525:6 – 531:2 (Richter).

49.    Waterfall Canyon is not a school and does not provide special education.

50.    Waterfall Canyon has some relationship with Oakgrove School, apparently a private education facility and separate entity, and that, together, Waterfall Canyon and Oakgrove School "work as a treatment team."  N.T. at 400:13 (Nickel).

51.    The order directing Colonial School District to pay for an RTF and to pay to address E.G.'s medical, behavioral, and mental health treatment needs is erroneous as a matter of law and fact.  *See, e.g., Mary T. v. Sch. Dist. of Philadelphia,* 575 F.3d 235, 248 (3d Cir. 2009) (discussing hospital-like regulatory and supervisory nature of private facility, and competencies of public school).

## Count III:  Colonial School District offered a FAPE

52.    Colonial School District incorporates the allegations above in Paragraphs 1 through 51 as if set forth at length.

53.    The hearing officer found Colonial School District's offer to place E.G. at Lifeworks, a therapeutic day school near Doylestown, Pennsylvania, was not appropriate for three reasons: (1) it was only a "potential" placement; (2) it was

a mismatch for E.G.'s needs; and (3) Colonial School District made no plan for transportation. H.O. Dec. at 9-11 of 14.

54.    *Potential placement*.  The hearing officer found that Colonial School District denied a FAPE because "it is not clear exactly what program the District offered," that despite clarity on paper, E.G. "has never been admitted to LifeWorks," and that "[a]s such, the District offered [E.G.] a placement that . . . may or may not have accepted [E.G.].  This ambiguity renders the District's offer inappropriate in and of itself." H.O. Dec. at 9-10 of 14.

55.    Yet the hearing officer finds that "[o]n paper, the District clearly offered LifeWorks." H.O. Dec. at 9 of 14.  Everyone understood that Colonial School District offered and proposed to implement a therapeutic day placement of full time Autistic Support at LifeWorks.

56.    The "ambiguity" that the hearing officer holds against Colonial School District is actually the result of parents' proven animosity toward Lifeworks.

57.    The parties discussed LifeWorks at the IEP Team meeting. N.T. at 32:8-9 (Gilmartin[8]); N.T. at 91:4-6, 118:2-4 (Berk[9]).

58.    Parents toured Lifeworks. N.T. at 97:6-8, 118:19-20 (Berk).

---

[8]    Dr. Caitlin Gilmartin, Colonial School District School Psychologist.
[9]    Karen Berk, Colonial School District Director of Pupil Services and Special Education.

59.    Parents and their associates met with and interviewed LifeWorks' staff for hours. N.T. at 132:21 – 133-16 (Berk); N.T. at 222:16-19 (mother).

60.    Colonial School District formally referred E.G.'s application to LifeWorks after parents visited. N.T. at 97:6-9 (Berk).

61.    The hearing officer concludes the offer was "ambiguous" and only "potential" because LifeWorks never accepted E.G., H.O. Dec. at 9 of 14, despite Candy Cohen, LifeWorks' Director of Intake, testifying that LifeWorks would accept E.G. but for the fact that his parents would not agree to placement at Lifeworks. N.T. at 489:5-14 (Cohen). That is, Lifeworks would accept E.G. but for parents' conduct. N.T. at 490:2-9 (Cohen).

62.    All private school programs are "potential" in the sense that a public school cannot compel a private school to accept any student.

63.    Before accepting a student, many private schools, particularly therapeutic educational placements and just like LifeWorks in this case, require that the family "buy-in" and indicate a willingness to engage constructively, even if begrudgingly, with the school to support the student because that is the first step toward successful therapeutic educational intervention.[10] N.T. at 489:16 – 490:1 (Cohen).

---

[10]    *See, e.g., S. v. Wissahickon School District*, Civ .A. 05-1284, 2008 WL 2876567 (E.D. Pa. July 24, 2008), *aff'd sub nom. Richard S. v. Wissahickon Sch. Dist.*, 334 F. App'x 508 (3d Cir. 2009) ("The Goldstein Report further stated that 'the real dilemma at this time is how to

64.    According to Ms. Cohen, parents had a bias against Lifeworks, that they came with an "obvious agenda" and "came looking for reasons to fault" LifeWorks. N.T. at 512:14 – 513:2 (Cohen).

65.    After meeting with parents for about three hours, parents' adverse attitude was clear to Ms. Cohen. N.T. at 490:2-9 (Cohen). The same and unmistakable impression remained after a further meeting with some of parents' entourage. N.T. at 490:23-25 (Cohen). "[I]t was apparent that the family was not interested in pursuing LifeWorks." N.T. at 497:9-11 (Cohen).

66.    The hearing officer indeed found that parents' attitude was "RTF or bust." H.O. Dec. at 13 of 14.

67.    Parents rejected the NOREP offering placement at LifeWorks.

68.    As a result, the referral process to LifeWorks stopped. N.T. at 146:3-14 (Berk). "[P]arents did not want to move forward with it and, therefore, we didn't move forward." N.T. at 146:22-24 (Berk); *see also* NT at 152:2-16 (Berk, describing "parent buy-in").

69.    Nonetheless, LifeWorks assured that it would accept E.G. (if parents consented) and that LifeWorks would be appropriate for him. N.T. at 146:3-12, 151:8-13 (Berk). LifeWorks has not rejected E.G.'s admission and enrollment.

---

engage this 17½ year old in developing an education and therapeutic program which he will even attempt . . . it is very difficult to 'help' someone against their will no matter how desperately they need it.' ").

N.T. at 491:1-3 (Cohen). *See also* NT at 497:9-11 (Cohen, "It's kept open but, you know, honestly, it was apparent that the family was not interested in pursuing LifeWorks.").

70.    This is no pig in a poke: if parents' "RTF or bust" stance and hostile attitude toward LifeWorks didn't undermine the process, Lifeworks would have accepted E.G.

71.    The hearing officer erred by upholding, in effect, a parent veto right over placement.

72.    The hearing officer erred by finding and concluding that Colonial School District's placement offer was "ambiguous" and "inappropriate in and of itself."

73.    <u>Mismatch</u>.  The hearing officer rejects Ms. Cohen's opinion that E.G. is a good match for Lifeworks, finding her opinion "suspect" because, he says, she did not have a clear picture of E.G.'s needs, testifying in broad generalities, but with the only specific supporting fact cited by the hearing officer being about transportation planning (discussed below). H.O. Dec. at 10 of 14.

74.    The hearing officer fails to explain a particular depth of student-specific knowledge he believes a director of admission to a private school must have, or that the law requires, and fails to set out or cite to any standard.

75.    Similarly, other than the descriptor "very shaky," H.O. Dec. at 10 of 14, the hearing officer set forth no criteria for the degree of evidence he requires, or that the law requires, to demonstrate an acceptable match between Lifeworks' programmatic capabilities and E.G.'s needs.  The hearing officer cited no evidence, apart from transportation (discussed below), in support of his "shaky" standard.

76.    Colonial School District witnesses and Ms. Cohen, testified about their bases for and their understandings of E.G.'s needs, which, remember, the hearing officer found are not fundamentally disputed.

77.    Colonial School District witnesses and Ms. Cohen also testified to their familiarity with Lifeworks and the supports and services available at Lifeworks relative to E.G.'s undisputed needs.  Among other things:

    a.    LifeWorks offers the availability, on campus, of RTF placement at Foundations of Behavioral Health, which is the mental and behavioral health sibling to Lifeworks, both under the umbrella entity, Foundations.  N.T. at 101:20 – 102:3 (Berk); N.T. 477:6-10, 480:10 481:1 (Cohen).

    b.    Caitlin Gilmartin, Colonial School District's school psychologist, testified to E.G.'s need for, and LifeWorks ability to provide, trauma-informed care and non-contingent reinforcement, something E.G. now needs as a result of years of mistreatment at the multiple unilateral

17

parental RTFs.  N.T. at 32:8-11, 65:25 – 67:8, 69:1-17, 81:10 – 82:21
(Gilmartin).

    c.  Ms. Cohen's job is to review applications and determine if
LifeWorks' capabilities would benefit the applicants, and that
includes assessing if she has enough information in her professional
judgement to make such a determination.  N.T. at 473:7-12 (Cohen).
She determined that, yes, Lifeworks would be a good match for E.G.,
but for parents' adverse agenda.  N.T. at 473:20-25, 474:18-21, 489:5-
8 (Cohen).  Ms. Cohen, as well as LifeWorks' supervisor of Autism
services, and LifeWorks' supervisor of special education (yes,
LifeWorks provides special education), and LifeWorks' board
certified behavior analyst, all reviewed Colonial School District's
reevaluation report, the subsequent IEP, as well as Oakgrove School's
"IEP," and "we all came to the same conclusion, that this is a student
who we feel that we could program for."  N.T. at 475:1-17 (Cohen).

78.    There is no convincing evidence undermining either Ms. Cohen's and
LifeWorks' judgment or Colonial School District witnesses' fact-based
professional judgements.

79.    The hearing officer erred in finding and concluding that LifeWorks is
a mismatch for E.G.

80. <u>Transportation</u>. The hearing officer's final critique is about transportation, stating "the District offered no plan for getting [E.G.] to and from Lifeworks," and that "Parents have established with preponderant evidence that it is simply unrealistic to expect [E.G.] to endure travel of that duration on a daily basis if that time is not carefully structured." H.O. Dec. at 10 of 14.

81. The hearing officer makes no finding of fact about E.G.'s alleged transportation needs, *e.g.*, there is no evidence that "transportation" is a non-preferred activity. H.O. Dec. at 10 of 14. There is minimal testimony that certain peers on the van ride at Waterfall Canyon can trigger behavioral discord, N.T. at 347:1-8, 389:23 – 390:10 (Ciraulo[11]) (and testimony of no plan for dealing with it, N.T. at 359:19 – 361:15, 390:11-14 (Ciraulo)), and that E.G. doesn't care for assigned seating N.T. at 389:19-24 (Ciraulo), but no evidence that riding a van itself is an adverse or non-preferred event for E.G.

82. The hearing officer gives no citation or factual finding to support his assertion that parents proved with "preponderant evidence," H.O. Dec. at 10 of 14, that E.G. cannot travel to and from LifeWorks.

83. There is no treatment plan, report, record, etc., from any of the many unilateral parental RTFs, including Waterfall Canyon, or any expert identifying E.G. having a need relating to transportation.

---

[11]    Suzanne Ciraulo, M.A., unspecified special education administrator (and no identified credential) for Oakgrove School. N.T. at 327:4-18.

84.    None of the unilateral parental RTFs, including Waterfall Canyon, has developed any intervention plan, goals, or "carefully structured" support of any sort relating to E.G. and transportation.

85.    No unilateral parental RTF treatment plan, report, record, etc., collected and analyzed any data relating to E.G. and transportation.

86.    The evidence shows that E.G. can be transported without any E.G.-specific plan or structure in place.

87.    The hearing officer improperly bends facts and Ms. Cohen's testimony relating to transportation and electronics. H.O. Dec. at 10 of 14.

88.    Ms. Cohen did not state that LifeWorks would engage in simple pacification by enabling and reinforcing E.G.'s obsession with electronics. Her testimony related to transportation of unspecified students, all generally and figuratively, and noted other activities equally diverting to a generic student, such as sleeping, reading, and music. N.T. at 485:4-19, 503:1-7 (Cohen).

89.    The hearing officer failed to credit Ms. Cohen's testimony regarding LifeWorks' "no cell phone policy" and LifeWorks' experience with students who "perseverate on video games and it's really up to us to help them transition off and that's a huge goal for us for some of our students." N.T. at 511:1-7 (Cohen).

90.    Ms. Cohen further testified to LifeWorks' efforts and abilities to teach and develop responsible use of electronics and not, as the many RTFs have done,

just take the electronics from E.G. to seek immediate elimination of, apparently, an addiction, with no protocol to inculcate responsible use. *See* NT at 510:23 – 511:14 (Cohen).

91.    There is no good evidence, certainly not preponderant evidence, that transportation of any duration, will result in E.G.'s inability to learn, and so requiring a residential educational placement in order to limit changes between settings, *ala' Kruelle v. New Castle Cty. Sch. Dist.*, 642 F.2d 687 (3d Cir. 1981) (stress-induced vomiting).

92.    The hearing officer erred in finding and concluding Colonial School District did not offer an appropriate educational placement.

**Count IV:  Waterfall Canyon is not "appropriate under the Act."**

93.    Colonial School District incorporates the allegations above in Paragraphs 1 through 92 as if set forth at length.

94.    Least restrictive environment.    Waterfall Canyon is highly "restrictive" and, if it were an educational placement, and contrary to the hearing officer's reasoning, it would violate the IDEA's least restrictive environment mandate for educational placements. *See Lauren W. v. Deflaminis*, 480 F.3d 259, 276 (3rd Cir. 2007).

21

95.    The hearing officer erred by rejecting any application of least restrictive environment and exaggerated the impact of *Warren G. v. Cumberland County. Sch. Dist.*, 190 F.3d 80 (3rd Cir. 1999).

96.    Applying least restrictive environment to unilateral placements, consistent with binding precedents, does not cause tuition reimbursement to "cease to function as an IDEA remedy," H.O. Dec. at 12 of 14; it just requires an analytical nuance and effort.[12]

97.    <u>Reasonably calculated</u>.    The hearing officer acknowledged, but disagreed, that Waterfall Canyon is just the next RTF in a sequence of unilateral parental RTF placement failures.  H.O. Dec. at 12 of 14.  *See also* HO Dec. at 4-5 of 14 FF 10 – 19 (recounting seven unilateral RTF placement prior to current RTF placement).  He reasons that Waterfall Canyon would finally succeed where all others failed, but never sets out evidence supporting such faith in Waterfall Canyon and how it is reasonably calculated to succeed.

---

[12]    *See Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 992-93 (1st Cir. 1990) ("Mainstreaming may not be ignored, even to fulfill substantive educational criteria."); *S.H. v. New York City Dept. of Educ.*, Civ. No. 09-6072, 2011 WL 609885, *9 (S.D. N.Y. Feb. 18, 2011) ("While parents seeking an alternative placement may not be subject to the same mainstreaming requirements as a school board, . . . IDEA's requirement that an appropriate education be in the mainstream to the extent possible remains a consideration that bears upon a parent's choice of an alternative placement and may be considered by the hearing officer in determining whether the placement was appropriate. . . .") (quotations and citations omitted). *See also A.S. v. Madison Metro. Sch. Dist.*, 477 F. Supp. 2d 969, --- 2007 WL 779110, *10 (W.D. Wisc. 2007) (holding that, "to be proper the [unilateral] placement had to provide A.S. an education in the [LRE]. . . .  A.S.'s placement at Heartspring School did not provide him an education in the [LRE].").

98.    He writes "[t]he evidence in this case established that the program [E.G.] received at Waterfall Canyon is different from what prior RTFs provided," H.O. Dec. at 12 of 14, but cites not one piece of "the evidence in this case."

99.    There is no evidence showing how, if at all, Waterfall Canyon is different from the others and that goes directly to what is "reasonably calculated" about Waterfall Canyon.    While Waterfall Canyon, as parents' unilateral placement, does not need to meet the same standards as a public school placement, just as with LRE however, it must be "appropriate" and provide significant learning. *Mary T. v. Sch. Dist. of Philadelphia*, 575 F.3d 235, 242 (3d Cir. 2009).

100.    The question of what is reasonably calculated or appropriate about Waterfall Canyon cannot be entirely unmoored from showing something, anything, that makes this unilateral placement "appropriate under the Act," such as how Waterfall Canyon analyzed past failures and successes in order to alter and tailor its approach so that might be likely to succeed where others failed.

101.    Instead, the evidence consists entirely of belief-driven testimonials that, in essence, this one will be different.  Self-interested "expert" assertions that that E.G. needs the XYZ RTF because the ABC RTF was unsuccessful is not evidence that Waterfall Canyon is appropriate under the Act.

102.    There is no trustworthy and analytical evidence and reasoning distinguishing Waterfall Canyon and how it is appropriate under the Act.

23

103. <u>Education is more than academics</u>.    The hearing officer writes, "[e]ducation . . . encompasses much more than academics – as is clearly evident in this case," H.O. Dec. at 8 of 14, and so errs by invoking an agreeable general proposition as a polemic to avoid critical analysis.

104. "[N]ot all services that can be broadly construed as educational are cognizable under IDEA." *Mary T. v. Sch. Dist. of Philadelphia*, 575 F.3d 235, 244 (3d Cir. 2009).  Critical analysis is required to ascertain the substantive goal to be achieved with the intervention at issue.

105. E.G. requires medical, behavioral, and mental health treatment as well as family support services to, as the hearing officer found, address independent living skills, rigidity, medication compliance, urinary frequency, sleep schedule, and general compliance, HO Dec. at 5 of 14 FF 23, as well as his apparent obsession or addiction with technology and video games, all under the supervision of clinicians.

106. The hearing officer erred by not undertaking the critical analysis required and determining that the substantive goal for E.G.'s unilateral parental RTF placement at Waterfall Canyon is to address his medical, behavioral, and mental health needs and where education is secondary.

107. As set forth above, the IDEA does not require public schools to provide medical, behavioral, and mental health treatment.

108.   The hearing officer erred by ordering Colonial School District to reimburse parents for the costs associated with EG's unilateral parental placement at Waterfall Canyon.

### Count V: Equities do not support reimbursement.

109.   Colonial School District incorporates the allegations above in Paragraphs 1 through 108 as if set forth at length

110.   Despite the candid admission about parents' attitude being "RTF or bust," the hearing officer finds parents' conduct passed the equitable, third prong, of the tuition reimbursement test, asserting they did not prevent Colonial from offering a FAPE. H.O. Dec. at 12 of 14.

111.   Equity is not binary, "prevent or did not prevent," and is unrelated to the question of a FAPE.

112.   The statutory test does not support the hearing officer's binary standard as the IDEA unambiguously provides that reimbursement may be reduced or denied "upon a judicial finding of unreasonableness with respect to the actions taken by the parents." 20 U.S.C. § 1415(a)(10)(C)(iii)(III).

113.   The hearing officer's selective listing of parental cooperation (parents "made [E.G.] available to the District for evaluations, participated in IEP team meetings, and toured LifeWorks," H.O. Dec. at 12 of 14), is part but not all of the factors applicable in this case.

114.   The hearing officer erred by applying an incorrect standard.

115.   The hearing officer erred by ignoring facts relating to parents' inequitable conduct or "unreasonableness" (and even his finding about parents' attitude) about the singularly animating issue: placement at LifeWorks.

### Count VI: Compounding Errors

116.   Colonial School District incorporates the allegations above in Paragraphs 1 through 115 as if set forth at length.

117.   <u>Burden shift</u>.   The hearing officer erred by deciding the issue as whether E.G. requires an RTF.

118.   The hearing officer erred by shifting the burden to Colonial School District to disprove a fact not in contention and not relevant to the case: whether E.G. requires an RTF placement to treat his medical, behavioral, and mental health needs and conditions.

119.   <u>The 2018 School District Reevaluation Report</u>.   The hearing officer found that the 2018 Reevaluation Report and the Colonial School District's school psychologist both generally agree with the parents' private psychologist's report and assertions.   H.O. Dec. at 5 of 14 FF 25.   And so, for this reason, the hearing officer wrongly gave the Colonial School District's school psychologist's testimony less weight.   H.O. Dec. at 7 of 14.

120.   The hearing officer explained that Caitlin Gilmartin generally agreed with Brandon Park's report and testimony "except for [his] conclusion about RTF placement," H.O. Dec. 7 of 14, adding that "[t]he District's psychologist's explanation about how she reached a different conclusion about [E.G.'s] need for an RTF placement based on nearly identical data was scant, not well-supported, and does not withstand scrutiny." H.O. Dec. 7 of 14.

121.   The hearing officer does not explain himself further and does not address why Caitlin Gilmartin's explanation was "scant" and "not well-supported."

122.   The hearing officer wrongly held Caitlin Gilmartin to a double or different standard, while Brandon Park's opinion escaped scrutiny and he was not required to explain why his opinion differed from hers.

123.   The hearing officer's "reasoning" shows he erred by assessing the merits of Caitlin Gilmartin's opinions and judgments solely according to the opinions of Brandon Park.

124.   Caitlin Gilmartin is a certified school psychologist.  N.T. at 24:24 (Gilmartin).  She is qualified to conduct school-based (re)evaluations and opine about student educational needs and programming.  Brandon Park is a Utah licensed psychologist, P-43 at 35 of 46, but not a school psychologist.  Brandon Park is qualified to opine about clinical treatment, but not school placements and educational programs.  *See also, e.g.*, N.T. at 504:5-11 (Cohen, deferring to a

27

clinical director to answer "what kind of students . . . need to be referred to a [RTF]. . . .").

125.   The hearing officer, who is supposed to know, and should know, the critical difference between a school psychologist and a licensed clinical psychologist, failed to explain why Caitlin Gilmartin's failure to go outside her field should be held against her.

126.   The hearing officer erred by giving less weight to Caitlin Gilmartin's testimony because she did not opine about an RTF placement.

127.   The hearing officer erred by requiring Caitlin Gilmartin to opine on the same playing field as Brandon Park, and then giving her views less weight when she declines, rightly, to go there.

128.   The hearing officer erred by giving less weight to Caitlin Gilmartin's testimony and opinions and greater weigh to Brandon Parks' testimony and opinions.

129.   <u>Adverse contradictory explanations</u>.   Caitlin Gilmartin testified that she does not compete a Reevaluation Record with placements in mind, but that educational placement decision are for the IEP Team.  N.T. at 32:1-7 (Gilmartin).

130.   The hearing officer writes, "it is striking that none of the District's evidence, including its own evaluation, explicitly concludes that residential

programming in general, or [the RTF] specifically, is inappropriate for [E.G.]." H.O. Dec. at 11 of 14.

131.   A school district is not required to disprove any point about parents' case, but only prove that it offered a FAPE.

132.   The hearing officer's commentary about the state of the school district evidence-in-opposition, is at logical odds with his immediately prior statement accusing Colonial School District of "predetermining" placement at LifeWorks. H.O. Dec. at 10 of 14 ("the District selected Lifeworks first and considered programming second").

133.   The hearing officer draws inconsistent but always district-adverse conclusions, on the one hand, of predetermining placement and, on the other hand, of not ruling out a residential placement prior to the IEP Team meeting.

134.   These and other errors cumulatively render the hearing officer's factual findings, analyses, and conclusions as inherently suspect and not entitled to deference.

**WHEREFORE**, Colonial School District respectfully requests that this Court:

a. Reverse the Hearing Officer's final Decision and Order and find that Colonial School District provided a FAPE, or

b. Reverse the Hearing Officer's final Decision and Order and find that the unilateral parental placement at Waterfall Canyon does not qualify for reimbursement under the IDEA, or is not appropriate under the IDEA, and reduce or deny all reimbursement and other relief awarded, or

c. Vacate the hearing officer Decision and Order with direction that parents must exhaust remedies through a determination of E.G.'s medical, behavioral, and mental health services needs, including any appeal, by the BHRS agency or any other § 1412(a)(12) public agencies prior to filing an IDEA administrative Complaint Notice against Colonial School District and seeking reimbursement from Colonial School District for the costs associated with E.G.'s unilateral parental placement at Waterfall Canyon.

d. Grant such other relief as is appropriate.

e. Enter judgment in favor of Colonial School District and against all Defendants.

Respectfully submitted,

Sweet, Stevens, Katz & Williams LLP

Date: <u>March 19, 2019</u>                    By: _____

Karl A. Romberger, Jr., Esquire,
PA60636
331 East Butler Avenue
Post Office Box 5069
New Britain, Pennsylvania 18901
Telephone: (215) 345-9111
kromberger@sweetstevens.com

*Attorneys for Plaintiff,*
*Colonial School District*

31

**Pennsylvania Special Education Due Process Hearing Officer**

**Final Decision and Order**
**ODR No. 21067-1819KE**
**CLOSED HEARING**

**Child's Name:**
E█  G█

**Date of Birth:**
████████

**Parent:**



**Counsel for Parent:**
Liliana Yazno-Bartle, Esquire
70 Easton Road
Willow Grove, PA 19090

**Local Education Agency:**
Colonial School District
230 Flourtown Road
Plymouth Meeting, PA 19462

**Counsel for the LEA:**
Karl A. Romberger, Jr., Esquire
331 Butler Avenue, PO Box 5069
New Britain, PA 18901

**Hearing Officer:**
Brian Jason Ford, JD, CHO

**Date of Decision:**
12/21/2018

**Introduction**

This matter concerns the educational rights of an older teenage student (the Student).[1] The Student's parents (the Parents) live within the School District (the District). The parties agree that the Student has significant academic and behavioral needs as a result of several disabilities. For the past several years, the Student's educational placement has been controlled by a series of settlement agreements between the Parents and the District. Pursuant to those agreements, the Student attended a series of out-of-state residential treatment facilities (RTFs). Those agreements have come to an end, and the parties are at an impasse concerning the Student's placement.

The Parents believe that the Student continues to require an RTF placement, and have selected an out-of-state RTF for the Student called Waterfall Canyon Academy (Waterfall Canyon).[2] The Parents ask me to find that Waterfall Canyon is appropriate, and order the District to fund that placement by reimbursing the Parents for tuition and necessary costs.

The District views Waterfall Canyon as the continuation of a series of RTFs that have failed the Student. There is little dispute many of the prior RTFs were not successful. The District is unwilling to fund what it views as more of the same.

For its part, the District has proposed placement at LifeWorks, a licensed private academic school in a therapeutic environment. The District seeks a finding that LifeWorks, specifically LifeWorks' Autism Academy, is appropriate for the Student.

For reasons discussed below, I find that the program offered by the District is not appropriate, Waterfall Canyon is appropriate, and the District must reimburse the Parents.

**Issue**

The only issue in this case is whether the District must reimburse the Parents for the Student's attendance at Waterfall Canyon.

**Findings of Fact**

I commend both attorneys in this case for their efficient presentation of evidence. Even so, I make findings of fact only as necessary to resolve the issues before me and, consequently, not all evidence is referenced in the findings below.

I find as follows:

---

[1] Except for the cover page, identifying information is omitted from this decision to the extent possible.

[2] The shear number of educational agencies and schools involved in this case require me to name some of the schools. To do otherwise would yield a confusing, difficult-to-read decision.

1.  There is no dispute concerning the history of the Student's placements, which is presented most clearly in a chart embedded in the Parent's closing brief. The Student has attended out-of-state RTFs since the 2015-16 school year which, chronologically was the Student's 8th grade year.

2.  There is no dispute that the Student attended multiple RTFs between the start of the 2015-16 school year and the Student's enrollment in Waterfall Canyon. The Student has consistently resided within RTFs from July 2015 through the present except for scheduled breaks, and a period from May 26, 2017 through August 10, 2017. The Student resided at home during those breaks and that gap.

3.  There is no dispute that the number of RTF placements that the Student has gone through is a function of those RTFs failing to meet the Students needs.

4.  There is no dispute that the Student's needs are intensive, and there is no dispute about the Students various medical and educational diagnoses. Most pertinent to this matter, the Student has been diagnosed with Autism Spectrum Disorder, ADHD, and OCD. The Student's impulsive, disruptive, and maladaptive behaviors are significant to the point were a diagnoses of imputes control and conduct disorder are warranted. P-3, P-6, P-8, P-11, P-15, P-17, P-23, P-43, P-66, P-69, P-71, P-94.

5.  There is no dispute that the Student's placement immediately before Waterfall Canyon was an RTF called Elevations/Seven Stars (Elevations). The Elevations program was funded by a settlement agreement between the Parents and the District. The Student attended the Elevations program from October 20, 2017 through May 11, 2018.

6.  The Student is obsessed with and perseverates about video games and electronics. Electronics are a preferred activity for the Student. Historically, removing electronics from the Student triggers significant behavioral outbursts. NT *passim*.[3] All attempts to place reasonable restrictions on the Student's access to electronics outside of RTF placements have failed - sometimes catastrophically. *See, e.g.* NT at 189-190, 743-755.

7.  Providing access to electronics will mollify the Student's behaviors, but removing them again, even temporarily, to switch to a non-preferred activity restarts the cycle. This yields aggressive outbursts. P-11, P-42, P-64.

8.  Even while attending RTFs, the Student's aggressive outburst have resulted in restraints. NT 214.

9.  The Student has a history of elopement. P-32, P-33, P-35, P-36.

---

[3] It is not clear if there is a dispute about this fact, but it is overwhelmingly supported by multiple witnesses throughout the transcript and multiple documents in evidence as well.

10. The first RTF that the Student attended could not handle the Student's aggressive, physical outbursts and elopements. It recommended a more intensive program. P-36.

11. The second RTF was also unable to address the Student's physical aggression, non-compliance with the program, and refusal to take medication. The Second RTF recommended an even more intensive program. P-42.

12. The third RTF was unable to safely separate the Student from electronics (its efforts to do so and to otherwise make the Student available for therapeutic programs resulted in serious behavioral incidents). The Parents and the third RTF ultimately agreed that the third RTF could not help the Student, and so the Student withdrew. See e.g. P-61, P-62.

13. After the third RTF, the Student stayed at home from May 26, 2017 through August 10, 2017. During this time, the Parents managed the Student's behavior by providing access to electronics and placing minimal demands on the Student (i.e. not forcing the Student to engage in non-preferred activities).

14. The Student attended the fourth RTF, called Daniel's Academy (Daniel's), for only four days. The Student came to Daniel's with electronics and refused to relinquish them. Daniel's staff could not safely remove the electronics, and dismissed the Student for that reason. Daniel's recommended the fifth RTF upon dismissal. P-64.

15. The fifth RTF was a wilderness therapy program. The Student remained in the wilderness therapy program for 66 days, but that did not break the Student's perseveration on electronics. The Student continued to exhibit maladaptive and non-compliant behaviors, rigidity, and anxiety. All of this resulted in the termination of the wilderness program before its completion, with the wilderness program recommending an intensive residential placement. P-65.

16. After the fifth RTF, the Student reapplied to Daniel's and was rejected. The Student needed a level of support that was beyond Daniel's program. NT 706-707, 717.

17. Ultimately the Parents found Elevations, the sixth RTF, and the Student was accepted there. The Student remained at Elevations for roughly seven months, excluding planned breaks, from October 18, 2017 through May 11, 2018. Upon intake at Elevations, the Student was seen by a psychiatrist and a master treatment plan was developed.[4] P-66, P-67.

18. The Student was disregulated and physically aggressive at the time of admission to Elevations, and attempted elopement twice. Eventually, the disregulation subsided, but the Student still was complex and challenging, with an apparent inability (or outright refusal) to engage in activities of daily living and self-care (hygiene, dressing, participating in routine activities). All transitions (including from the Student's bedroom to the hallway) could prove difficult. The Student was also

---

[4] Master treatment plans were developed at the other RTFs as well.

extremely rigid and fixed in beliefs, even relative to other individuals with Autism. NT 294-295, 727, 725.

19. Despite extreme difficulties, the Student made some progress at Elevations. By the end of the Student's time at Elevations, the Student was no longer disregulated, could tolerate exposure to some of Elevations' therapeutic and academic programs, and had shown improvement in some life skills. NT at 320, 726. Even so, the Student's behavioral and academic difficulties continued to persist. *See* P-71. The Student's progress at Elevations can best be described as stabilization.

20. The Parents retained a private neuropsychologist, who evaluated the Student and wrote a report. In the report, the private neuropsychologist concluded that the Student could not be successful outside of a residential setting, and recommended transfer from Elevations to a highly-structured, intensive, residential program that focuses on the development of life skills and provides therapies intended to make students like the Student in this case available for instruction. P-94.

21. The private neuropsychologist views placement in a day program or outpatient therapeutic program as a long term goal for the Student. P-681.

22. The Student left Elevations and enrolled in Waterfall Canyon upon the recommendation of the private neuropsychologist. The Student started at Waterfall Canyon on May 14, 2018. Consistent with Elevations and the neuropsychologist's report, the staff at Waterfall Canyon have seen, and are programming for, significant deficits in the Student's adaptive behaviors, daily living skills, self care skills, communication skills, self-regulation, and safety skills. NT at 391-397.

23. Waterfall Canyon provides year-round residential treatment and education through a school licensed by the state in which it is located. At Waterfall Canyon, the Student receives intensive, around-the-clock supports with a focus on independent living skills, and therapies to decrease the Student's rigidity. Treatment at Waterfall Canyon initially focused on the Student's medication compliance, urinary frequency (an escape behavior), sleep schedule, and general compliance. The Student has made some progress in all of those domains, and has started participating in the academic program as well. Of equal importance, at Waterfall Canyon, the Student accepts limited and controlled access to electronics. P-39; NT at 533, 583, 634.

24. The District reevaluated Student, and issued a reevaluation report on June 1, 2018 (2018 RR). P-74. The Parents brought the Student home to be available for the evaluation.

25. The District's psychologist, who conducted the revaluation and authored the 2018 RR, agrees that the Student's behaviors are maladaptive and that the Student is averse to school. NT at 47-48. The 2018 RR itself is generally consistent with the private neuropsychological report, and the District's psychologist agreed with the private neuropsychologist's diagnostic findings. NT at 49.

26. The 2018 RR does not say anything about the Student's needs for a residential placement. The District's psychologist testified that she does not believe that the Student requires a residential placement to receive an appropriate education, but also testified that she could not recall any particular or specific disagreements with the private neuropsychological report. NT at 49.

27. After the 2018 RR, the Student returned to Waterfall Canyon. The District convened the Student's IEP team and recommended placement at LifeWorks, a licensed private academic school in a therapeutic environment. NT at 746. Lifeworks is a day program.

28. The Parents toured LifeWorks and met with LifeWorks' director of admission. During the tour, the Parents became concerned about the intensity of therapies that the Student would receive at LifeWorks. *See, e.g.* NT at 226.

29. Based on information provided by a transportation company, it takes one hour and 30 minutes to transport the Student to LifeWorks in the morning and 1 hour and eight minutes to transport the Student back home in the afternoon. P-86.

30. When asked how the Student's behaviors would be managed during transportation to and from LifeWorks, the director of admissions suggested that the Student could use electronics (video games or music players). NT 485, 503.

31. The Parents gave consent for the District to share information about the Student with LifeWorks. The Parents requested to tour LifeWorks again, but were denied. NT at 226, 255.

32. The District recommended LifeWorks through a NOREP on July 25, 2018. S-51, S-55.

33. The Student has never been admitted to LifeWorks. NT at 145, 493.

### Witness Credibility

During a due process hearing, the hearing officer is charged with the responsibility of judging the credibility of witnesses, and must make "express, qualitative determinations regarding the relative credibility and persuasiveness of the witnesses." *Blount v. Lancaster-Lebanon Intermediate Unit*, 2003 LEXIS 21639 at *28 (2003). One purpose of an explicit credibility determination is to give courts the information that they need in the event of judicial review. *See, D.K. v. Abington School District*, 696 F.3d 233, 243 (3d Cir. 2014) ("[Courts] must accept the state agency's credibility determinations unless the non-testimonial extrinsic evidence in the record would justify a contrary conclusion."). *See also, generally David G. v. Council Rock School District*, 2009 WL 3064732 (E.D. Pa. 2009); *T.E. v. Cumberland Valley School District*, 2014 U.S. Dist. LEXIS 1471 *11-12 (M.D. Pa. 2014); *A.S. v. Office for Dispute Resolution (Quakertown Community School District)*, 88 A.3d 256, 266 (Pa. Commw. 2014); *Rylan*

*M. v Dover Area Sch. Dist.*, No. 1:16-CV-1260, 2017 U.S. Dist. LEXIS 70265 (M.D. Pa. May 9, 2017).

In this case, all witnesses testified credibly in the sense that none give any indication of an effort to obscure facts or hide the truth. This does not mean that I assign equal weight to all testimony. Two points about weight are worth noting:

First, the Parents argue that I should give added  weight to the private neuropsychologist's report and testimony because Waterfall Canyon competes with his own programs. I reject that argument. Private evaluators do not typically sell the services that they recommend. I do not give extra weight to the private neuropsychologist in this case simply because he is in the same position as most private evaluators in most cases.

Second, the District psychologist's testimony concerning the Student's need for residential placement is given reduced weight. The District psychologist's report and testimony are consistent with the reports and testimony from other evaluators, and the psychologist explicitly agreed with the private neuropsychological evaluation report (except for its conclusion about RTF placement). The District's psychologist's explanation about how she reached a different conclusion about the Student's need for an RTF placement based on nearly identical data was scant, not-well supported, and does not withstand scrutiny.

### Legal Principles

### *The Burden of Proof*

The burden of proof, generally, consists of two elements: the burden of production and the burden of persuasion. In special education due process hearings, the burden of persuasion lies with the party seeking relief. *Schaffer v. Weast*, 546 U.S. 49, 62 (2005); *L.E. v. Ramsey Board of Education*, 435 F.3d 384, 392 (3d Cir. 2006). The party seeking relief must prove entitlement to its demand by preponderant evidence and cannot prevail if the evidence rests in equipoise. *See N.M., ex rel. M.M. v. The School Dist. of Philadelphia*, 394 Fed.Appx. 920, 922 (3rd Cir. 2010), citing *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004). In this particular case, the Parent the party seeking relief and must bear the burden of persuasion.

### *Free Appropriate Public Education (FAPE)*

The IDEA requires the states to provide a "free appropriate public education" to all students who qualify for special education services. 20 U.S.C. §1412. Local education agencies, including school districts, meet the obligation of providing a FAPE to eligible students through development and implementation of IEPs, which must be "'reasonably calculated' to enable the child to receive 'meaningful educational benefits' in light of the student's 'intellectual potential.'" *Mary Courtney T. v. School District of Philadelphia*, 575 F.3d 235, 240 (3d Cir. 2009) (citations omitted). Substantively, the IEP must be

responsive to each child's individual educational needs. 20 U.S.C. § 1414(d); 34 C.F.R. § 300.324.

This long-standing Third Circuit standard was confirmed by the United States Supreme Court in *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988 (2017). The *Endrew F.* case was the Court's first consideration of the substantive FAPE standard since *Board of Educ. of Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176, 206-07, 102 S.Ct. 3034 (1982).

In *Rowley*, the Court found that a LEA satisfies its FAPE obligation to a child with a disability when "the individualized educational program developed through the Act's procedures is reasonably calculated to enable the child to receive educational benefits." *Id* at 3015.

Historically the Third Circuit has interpreted Rowley to mean that the "benefits" to the child must be meaningful, and the meaningfulness of the educational benefit is relative to the child's potential. *See T.R. v. Kingwood Township Board of Education*, 205 F.3d 572 (3rd Cir 2000); *Ridgewood Bd. of Education v. N.E.*, 172 F.3d 238 (3rd Cir. 1999); *S.H. v. Newark*, 336 F.3d 260 (3rd Cir. 2003).

Under the historical meaningful benefit standard, a school district is not required to maximize a child's opportunity; it must provide a basic floor of opportunity. *See Lachman v. Illinois State Bd. of Educ.*, 852 F.2d 290 (7th Cir.), *cert. denied,* 488 U.S. 925 (1988). However, the meaningful benefit standard required LEAs to provide more than "trivial" or "de minimus" benefit. *See Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171, 1179 (3d Cir. 1998), *cert. denied* 488 U.S. 1030 (1989). *See also Carlisle Area School v. Scott P.*, 62 F.3d 520, 533-34 (3d Cir. 1995). It is well-established that an eligible student is not entitled to the best possible program, to the type of program preferred by a parent, or to a guaranteed outcome in terms of a specific level of achievement. *See, e.g., J.L. v. North Penn School District*, 2011 WL 601621 (E.D. Pa. 2011). Thus, what the statute guarantees is an "appropriate" education, "not one that provides everything that might be thought desirable by 'loving parents.'" *Tucker v. Bayshore Union Free School District*, 873 F.2d 563, 567 (2d Cir. 1989).

In *Endrew F.*, the Supreme Court effectively agreed with the Third Circuit by rejecting a "merely more than *de minimus*" standard, holding instead that the "IDEA demands more. It requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. 988, 1001 (2017). Appropriate progress, in turn, must be "appropriately ambitious in light of [the child's] circumstances." *Id* at 1000. In terms of academic progress, grade-to-grade advancement may be "appropriately ambitious" for students capable of grade-level work. Id. Education, however, encompasses much more than academics — as is clearly evident in this case.

The essence of the standard is that IDEA-eligible students must receive specially designed instruction and related services, by and through an IEP that is reasonably

calculated at the time it is issued to offer an appropriately ambitious education in light of the Student's circumstances.

### *Tuition Reimbursement*

To determine whether parents are entitled to reimbursement from their school district for special education services provided to an eligible child at their own expense, a three part test
is applied based upon *Burlington School Committee v. Department of Education of Massachusetts,* 471 U.S. 359 (1985) and *Florence County School District v. Carter*, 510 U.S. 7 (1993). This is referred to as the *"Burlington-Carter"* test.

The first step is to determine whether the program and placement offered by the LEA is appropriate for the child. That is, did the LEA offer a FAPE. The second step is to determine whether the program obtained by the parents is appropriate for the child. As discussed below, the appropriateness of the parentally-selected placement is not the same as the FAPE standard. The third step is to determine whether there are equitable considerations that counsel against reimbursement or affect the amount thereof. *Lauren W. v. DeFlaminis*, 480 F.3d 259 (3rd Cir. 2007). The steps are taken in sequence, and the analysis ends if any step is not satisfied.

### Discussion

As described above, the three-part *Burlington-Carter* test is used to determine whether the District must reimburse the Parents for the Student's RTF placement. I find that the District did not offer a FAPE to the Student, the RTF placement is appropriate under the *Burlington-Carter* standard, and that no equitable considerations warrant a reduction in tuition reimbursement.

## I.    The District's Offer is Not Appropriate

The Parents disagree with the District's conclusion that the Student does not require a residential placement. The District's conclusion, stated through the NOREP and testimony even if not explicit in the District's own evaluation is the heart of the dispute. Even so, it is not necessary for me to resolve the Student's need for a residential placement to complete the first prong of the *Burlington-Carter* analysis. There is preponderant evidence that the District's offer is not appropriate for the Student regardless of the Student's need for a residential placement.

First, it is not clear exactly what program the District offered. On paper, the District clearly offered LifeWorks. In reality, the District had not applied for the Student's admission to LifeWorks at the time LifeWorks was offered. Moreover, the Student has never been accepted to LifeWorks. As such, the District offered the Student a placement that, at that time, may or may not have accepted the Student. This

ambiguity renders the District's offer inappropriate in and of itself. NOREPs must offer a placement - not a potential placement.

Ignoring the ambiguity that renders the NOREP inappropriate, LifeWorks' director of admission generally testified that the Student is a good match with LifeWorks' program, but her foundation for that opinion is suspect. The director of admission revealed through her testimony that she does not have a clear picture of the Student's needs. For the most part, the director of admissions testified to the Student's needs, LifeWorks' programs, and the match between the two, only in broad generalities. When the director of admissions testified more specifically, that testimony revealed a lack of knowledge about the Student's needs. One significant example of this is her testimony concerning the Student's transportation needs. LifeWorks' director of admissions did not understand that providing electronics to the Student during transportation and then taking the electronics away from the Student upon arrival would would be triggering, and therapeutically contraindicated.

The District offered LifeWorks before knowing whether LifeWorks would accept the Student, never secured admission to LifeWorks, and then provided only very shaky evidence about the match between Lifeworks' program and the Student's needs. Under these circumstances, I find that the District determined to offer LifeWorks first, and then resolve the particulars of the Student's program. This is the opposite of what the IDEA requires. An appropriate placement determination can be made only after the Student's needs are assessed and the IEP team determines what services the Student needs. It is inappropriate to make a placement determination first, and then craft an IEP around the services available at the placement.

Second, even if there was a perfect match between the Student's needs and LifeWorks' program, the District offered no plan for getting the Student to and from LifeWorks. It would take one hour and 30 minutes to transport the Student to LifeWorks in the morning and 1 hour and eight minutes to transport the Student back home in the afternoon. The Parents have established with preponderant evidence that it is simply unrealistic to expect the Student to endure travel of that duration on a daily basis if that time is not carefully structured. The District proposes no plan to structure that time; no Student-specific support plan for transportation. LifeWorks suggestion to occupy the Student with electronics during transportation is not appropriate under the facts of this case, and shows a gross misunderstanding of the Student's needs. Removing electronics from the Student at the same time a non-preferred task is introduced has been consistently disastrous both for the Student and the personnel who work with the Student.

In conclusion, there is very little evidence matching LifeWorks' program with the Student's specific needs, the District selected LifeWorks first and considered programming second, the District did not know if LifeWorks would accept the Student at the time the District offered LifeWorks, and LifeWorks had not reviewed information about the Student at the time of the placement offer. Neither the District nor LifeWorks could offer a comprehensive, logical explanation of how LifeWorks would address this Student's individual needs — or how the Student could get to and from LifeWorks

every day. I find that the District failed to offer an appropriate placement for these reasons.

## II.  Waterfall Canyon is Appropriate

A preponderance of evidence establishes that Waterfall Canyon is appropriate for the Student. For this second part of the *Burlington-Carter* analysis, I cannot make the same assumptions concerning the parties' disagreement over the Student's need for a residential placement. However, at this stage, I consider the appropriateness of Waterfall Canyon on its own merits, not relative to the District's placement offer. The inappropriateness of the District's offer says nothing about the appropriateness of the Parents' choice.

The Parents must establish that Waterfall Canyon is appropriate, it is not the District's obligation to establish the opposite. Even so, it is striking that none of the District's evidence, including its own evaluation, explicitly concludes that residential programming in general, or Waterfall Canyon specifically, is inappropriate for the Student.

Evidence of Waterfall Canyon's appropriateness is preponderant. The private neuropsychological evaluation was comprehensive and included direct observations of the Student. Analyzing the information from the evaluation, the private neuropsychologist concluded that the Student continued to require a residential placement. That conclusion was well-supported by the evaluation itself, which reveals a need for intensive, around-the-clock programming to provide immediate behavioral feedback. This conclusion is echoed in the testimony from every witness who has provided services to the Student in recent memory. The District's own psychologist agreed with diagnostic findings in the private neuropsychological report except for its conclusion that the Student required a residential setting — but could not explain the basis of that disagreement. A preponderance of evidence, therefore, establishes the Student's educational need for an RTF. There is no preponderant evidence to the contrary.

I recognize that establishing the need for an RTF and establishing the appropriates of Waterfall Canyon specifically are different things, particularly because prior RTFs have failed the Student. In this case, preponderant evidence establishes that Waterfall Canyon is appropriate for the Student. Waterfall Canyon is a community-based therapeutic residential treatment center with its own school, which is licensed through the department of education of the state in which it is located. The Student receives a structured, intensive program with therapies and therapeutic feedback provided throughout the day. Waterfall Canyon is different from prior placements not in terms of the amount of time per day that the Student is in a therapeutic program, but rather in terms of the intensity, structure, and focus of the program. It is not a wilderness exposure program, or a program designed to simply stabilize the Student. Rather, it is a structured, intensive, around-the-clock therapeutic and academic placement. In many ways, Waterfall Canyon is a natural progression from the Elevations placement. The Waterfall Canyon program is aligned with every evaluation of the Student's needs.

Those evaluations would also include the District's own evaluation, but for its conclusion about residential placement. I find that Waterfall Canyon is an appropriate placement for the Student.

In reaching this conclusion, I must acknowledge the District's arguments about the restrictiveness of residential placements, and the history of failed residential placements in this case. Although the District's arguments are well-reasoned, they ultimately fail.

Regarding restrictiveness, there is no doubt that the Waterfall Canyon is a highly-restrictive placement. However, the appropriateness of parentally-selected placements is not judged to the same standard as LEA FAPE offers in the second prong of the *Burlington-Carter* test. *See Warren G. v. Cumberland County School District*, 190 F. 3d 80 (3d Cir. 1999). This lower standard is particularly applicable to assessments of the restiveness of the parentally-selected placement. Nearly any parentally-selected placement will be more restrictive than an LEA placement by definition. If restrictiveness were conclusive, tuition reimbursement would cease to function as an IDEA remedy.

Regarding the District's argument about past failures, I take the District's point but respectfully disagree. It is true that RTFs have failed the Student in the past, but that says little about the program that the Student received in each of past RTFs. The evidence in this case establishes that the program the Student receives at Waterfall Canyon is different from what prior RTFs provided. Even if the issue was before me, proving the inappropriateness of prior RTFs would not also prove that Waterfall Canyon is inappropriate because the program at Waterfall Canyon is different.

## III.  Equitable Considerations

Tuition reimbursement awards must be reduced or eliminated if equitable considerations so require. The District argues that the Parents sabotaged its efforts in providing an appropriate placement at LifeWorks, and should not be rewarded for that action. The District is correct that tuition reimbursement is not equitable if the Parents prevented the District from offering a FAPE.[5] I find, however, that the Parents did not hinder the District's efforts to provide a FAPE to the Student. The Parents made the Student available to the District for evaluations, participated in IEP team meetings, and toured LifeWorks.

---

[5] The District makes this argument by citing to *White ex rel. White v. Ascension Par. Sch. Bd.*, 343 F.3d 373 (5th Cir. 2003); *AW ex rel. Wilson v. Fairfax Cty. Sch. Bd.*, 372 F.3d 674, 683 (4th Cir. 2004); and *Bobby v. School Board of City of Norfolk*, Civ. A. 2:13-0714, 2014 WL 3101927 (E.D. Va. July 7, 2014). While these cases come from other jurisdictions, they are well reasoned. *Bobby v. School Board* is the most on point. I will not endeavor to square these cases with Pennsylvania and Third Circuit jurisprudence, however, because I find that the Parents did not sabotage the District.

I agree with the District that the Parents came to the IEP development process with a strong preference for a residential placement. In fact, it is more likely than not that the Parents would have rejected any non-residential placement that the District offered. It is fair to say that the Parents' attitude has been something akin to 'RTF or bust' for years.

The concept of parental pre-determination is not well-developed in IDEA jurisprudence. But even if parental pre-determination was grounds to reduce or eliminate tuition reimbursement, I would not do so in this case for two reasons. First, whatever the Parents' preferences were, they did not prohibit the District from offering a FAPE to the Student. Second, for reasons discussed above, the Student requires an RTF placement.

I reject the argument that the Parents' somehow exercised a veto during IEP development. I find that the Parents did not prohibit the District from offering a placement because the District offered a placement. It is true that the placement offer was problematic for all of the reasons discussed above, but the District did offer a NOREP and stands by that NOREP. More importantly, the Student's need for an RTF outweighs any argument about sabotage. There is some evidence that the Parent's vocal disapproval of LifeWorks contributed to LifeWorks not formally offering a placement. Even if there was enough evidence to conclude that LifeWorks would have accepted the Student but for the Parents' actions, that conclusion is irrelevant. At best, that would establish that the Parents took action to hinder the Student's placement in an inappropriate setting. If LifeWorks could have been appropriate, the District would have a very strong argument. Under the facts of this case, I must reject the District's argument.

The District also urges me to consider the Student's wishes. The Student will soon enter adulthood, and has expressed a desire to come home. For IDEA decision-making purposes, the Student has not yet reached the age of majority in Pennsylvania. Children of all ages should have a voice in educational decision-making, but I am unaware of any case in which tuition reimbursement has been reduced or eliminated because a child disliked the school that the parents selected.[6]

Finally, the District argues that the Parents have not exhausted available interventions provided by other agencies. The District highlights that the Student is still eligible for BHRS services, funded through Medical Access, that may include residential placements. I agree with the District that the Student and Parents may be entitled to a host of services from other agencies, and that the Parents have not taken full advantage of those services. The Parents decision to forego other available services and seek help from the District alone is unfortunate, especially considering the considerable efforts that have resulted in an intensive interagency process in

---

[6] I caution the Parents to take the Student's wishes seriously - especially as the Student reaches the age of majority for educational and mental health purposes. Laws about the transfer of rights upon reaching the age of majority for educational and mental health purposes are not always consistent with each other, and are not always consistent state-to-state.

Pennsylvania. *See Cordero v. Pa. Dep't of Educ.*, 795 F. Supp. 1352 (M.D. Pa. 1992). Even so, I am unaware of any case holding that the potential availability of services from third party agencies reduces an LEA's obligations under the IDEA. Consequently, I reject the District's argument concerning the availability of support from other agencies.

### ORDER

Now, December 21, 2018, it is hereby **ORDERED** that the District shall reimburse the Parents for the cost of tuition and any other services required for participation at Waterfall Canyon Academy. Other services includes transportation to and from Waterfall Canyon Academy on days when Waterfall Canyon Academy has scheduled breaks. Other services does not include transportation to and from Waterfall Canyon Academy to accommodate parental preferences. Transportation costs are limited to lowest market-rate coach transpiration for the Student and for no other person.

It is **FURTHER ORDERED** that any claim not specifically addressed in this order is DENIED and **DISMISSED.**

/s/ Brian Jason Ford
HEARING OFFICER