# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| COLONIAL SCHOOL DISTRICT, | : | CIVIL ACTION |
| --- | --- | --- |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| E.G., *by and through his parents*, M.G. *and* J.G.*, and* M.G. *and* J.G.*, individually*, | : | No. 19-1173 |
| | : | |
| Defendants. | : | |
| | : | |

## MEMORANDUM OPINION

**TIMOTHY R. RICE**                                                                 **JANUARY 31, 2020**
**U.S. MAGISTRATE JUDGE**

      An administrative hearing officer ordered Plaintiff Colonial School District (Colonial) to reimburse Defendant E.G.'s parents for private tuition expenses because Colonial did not offer him a free appropriate public education (FAPE). For the reasons explained below, I affirm.

      E.G. is a special education student with several medical and educational diagnosis, including Autism Spectrum Disorder. Since 2015, he has been enrolled in out-of-state private residential placements that provide both around-the-clock behavioral support and education programs. In 2018, Colonial re-evaluated E.G. and issued an updated individual education plan (IEP) featuring placement in a local nonresidential program, LifeWorks. After touring the offered placement, his parents, Defendants M.G. and J.G., filed a due process complaint alleging Colonial did not offer E.G. a FAPE, as required under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq (IDEA). E.G.'s parents kept him enrolled in his current residential program and sought tuition reimbursement instead of accepting placement at LifeWorks.

**STANDARD OF REVIEW**

I must conduct a "modified de novo" review of the Hearing Officer's decision, giving "due weight" to his factual determinations. S.H. v. State-Operated Sch. Dist. of City of Newark, 336 F.3d 260, 269–70 (3d Cir. 2003). I must consider those factual findings to be prima facie correct and, when the Hearing Officer makes credibility determinations based on live testimony, I must accept those determinations unless nontestimonial extrinsic evidence justifies a contrary conclusion. D.K. v. Abington Sch. Dist., 696 F.3d 233, 243 (3d Cir. 2012). Colonial must overcome the "presumption that the Hearing Officer's findings were correct." M.G. v. N. Hunterdon-Voorhees Reg'l High Sch. Dist. Bd. of Educ., 778 F. App'x 107, 110 (3d Cir. 2019); see also Ridley Sch. Dist. V. M.R., 680 F.3d 260, 270 (3d Cir. 2012) ("the District Court . . . err[ed] by placing the burden on Parents with respect to the findings of the Hearing Officer that were challenged by [the school district]"). I review conclusions of law de novo. In re Educ. Assignment of Joseph R., 318 F. App'x 113, 118 (3d Cir. 2009).

**FACTS**[1]

E.G. is a seventeen-year-old student diagnosed with Autism Spectrum Disorder, Obsessive Compulsive Disorder (OCD), Attention Deficit Hyperactivity Disorder (ADHD), and a conduct disorder. Hearing Officer Decision (Dec.) (doc. 16, Ex. 2) at 3, 10. He has significant impulsive, disruptive, and maladaptive behaviors and is obsessed with video games and electronics. Id. at 3. Attempts to place reasonable restrictions on electronics have resulted in elopement, i.e. absconding, and aggressive outbursts requiring psychical restraint. Id. E.G.'s conduct disorder and obsession with electronics inhibit his engagement with behavioral and

---

[1] The facts are taken primarily from the Hearing Officer's decision. See S.H., 336 F.3d at 270. Additional facts are taken from the administrative record, which is largely undisputed.

educational programs.  Id. at 4.

From July 2015 to March 2016, he attended Little Keswick School.  P-36 at 1.[2]  He was discharged due to "pervasive and chronic levels of anxiety, control issues, organizational difficulties, and significant social communication" problems.  Id.  The school recommended an intensive program focused on OCD and anxiety symptoms.  Id.

Since the 2015–16 school year, E.G. has been enrolled in out-of-state residential programs.  Id. at 3.

From March 2016 to May 2016, E.G. was enrolled at Mountain Valley Treatment Center.  P-42 at 1.  This placement did not include education services and was funded by E.G.'s parents.  N.T. at 203.  E.G. was discharged because of his resistance to treatment, which included absconding, yelling, slamming a chair, pushing a staff member, and refusing to take medication.  Dec. at 4, P-42 at 3.  Mountain Valley recommended additional testing to help find an appropriate therapeutic environment.  P-42 at 3.  E.G. spent the remainder of that summer at home.  Dec. at 4, P-42 at 2.

From August 2016 to May 2017, E.G. attended Chamberlain International School.  P-61 at 1.  He remained obsessed with electronics and refused to engage in the behavioral and educational programs.  Id. at 2.  Attempts to limit electronics use were often met with absconding or physical violence, which required physical restraint.  Id.  E.G. was removed from Chamberlain because his parents felt the program was not helping.  Id., Dec. at 4.

For four days in August 2017, E.G. was enrolled in Daniels Academy.  Dec. at 4, P-64 at 1.  He was "rigid and unable to process any information contrary to his goal of keeping his electronics."  P-64 at 1.  When confronted with relinquishing his electronics, he absconded three

---

[2]  At the due process hearing, Colonial's exhibits were labeled with an "S" and the parents' exhibits were labeled with a "P".  See doc. 16.  Respectively, they are compiled in Exhibits 6 and 7 of the administrative record.  Id.

3

times and threatened to hurt himself.  Id.  As a result, E.G. was discharged and the school recommended he attend a wilderness program to address his rigid, maladaptive behaviors and obsession with electronics.  Id.

From August 2017 to October 2017, E.G. attended Vantage Point Wilderness Therapy. Dec. at 4, P-65 at 1.  He had rigid opinions and would constantly "test his guides, boundaries, and expectations."  P-65 at 2.  He remained focused on his electronics obsession.  Id.  If he did not get what he wanted, he would often abscond.  Id.  E.G. was discharged because he was not engaging in the program and had aggressive incidents, including throwing a "baseball[-]size" rock at another student.  N.T. at 213, P-65 at 2.  Vantage Point recommended future placement in a residential treatment facility.  Dec. at 4, P-65 at 2.

From October 2017 to May 2018, E.G. attended Elevations/Seven Stars Residential Treatment Center (Elevations).  Dec. at 4, P-66 at 1.  E.G. was "one of the most challenging students" the staff had worked with; he was dysregulated and physically aggressive.  N.T. at 726, Dec. at 4.  Basic daily actives were difficult, including hygiene.  Id.  He eventually progressed and began engaging in therapeutic and academic programs. Dec. at 5.  A psychiatric evaluation concluded that E.G. is a complex student with developmental issues and that he will have difficulty functioning in a regular school setting.  P-66 at 7.  Elevations "strongly recommended" that E.G. attend a residential program which has a "structured school [environment] with limit setting for behavioral issues."  Id. at 7.

Since May 2018, E.G. has been enrolled at Waterfall Canyon Academy.  Dec. at 5, Pl. Opp'n Br. at 15.  Waterfall Canyon is a residential program, licensed by the Utah State Department of Health, which provides education through Oakgrove, an on-campus school licensed by the Utah State Department of Education.  Dec. at 5, Pl. Opp'n Br. at 15.  The

4

residential and school staff work in tandem.³ Dec. at 5, Pl. Opp'n Br. at 15, N.T. at 329, 382, 400. Waterfall provides around-the-clock support to help with E.G.'s deficits in adaptive behaviors, daily-living skills, self-care skills, safety skills, self-regulation, and communication. Dec. at 5. As of November 2018, E.G. attended educational programs five days a week, for five-and-a-half hours each day, and accepted limited and controlled access to electronics. Id., N.T. at 341–42.

In July 2018, after E.G. was re-evaluated, Colonial issued a notice of recommended educational placement (NOREP) and an updated IEP. P-79, N.T. at 90. Colonial recommended LifeWorks, which is a licensed "academic school in a therapeutic environment" on the Foundations Behavioral Health campus in Bucks County, Pennsylvania. Pl. Br. at 8, N.T. at 476–77. LifeWorks is a day program that offers trauma-informed care and autism support services. Pl. Br. at 8, N.T. at 66, 476.

At the due process hearing, which took place over the course of three days from September to November 2018, the parties agreed on E.G.'s medical diagnoses and that he needs an educational environment with significant structure and therapeutic assistance. Dec. at 2–3, P-94 at 3, P-74 at 16–17, P-79 at 12. They disagreed about the type of program that would provide the needed structure for E.G. to receive a FAPE. Dec. at 2.

**DISCUSSION**

States accepting federal funds allocated for the education of students with disabilities are

---

³ Colonial contests this finding, arguing that Oakgrove is "a private education facility and separate entity" from Waterfall Canyon. See Pl.'s Br. (doc. 20) at 7. I find substantial evidence that the residential and school staff operate as one team. See P-88 (Waterfall Canyon and Oakgrove staff both contribute to Shift Communications Logs), N.T. at 329, 330, 344, 382 (testimony that the residential and school staff have monthly meetings to discuss progress, Waterfall Canyon therapists have offices and meet with students at Oakgrove, and both staffs attend meetings to discuss living skills, group therapy, social skills and academics).

5

required to provide a FAPE to all eligible children. 20 U.S.C. § 1412(a)(1). If the school district fails to offer a FAPE, a child may be enrolled in an appropriate private school and the school district may be obligated to reimburse parents for private tuition expenses. § 1412(a)(10)(C)(ii). Under the "Burlington-Carter" test, parents are eligible to receive private tuition reimbursement if: "(1) the public school did not provide FAPE; (2) placement in a private school was proper; and (3) the equities weigh in favor of reimbursement." Dep't of Educ. v. D.E., No. 17-4433, 2019 WL 1505859, at *9 (E.D. Pa. Apr. 5, 2019) (citing Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass., 471 U.S. 359, 369–70, 373–74 (1985) and Florence Cty. Sch. Dist. Four v. Carter By & Through Carter, 510 U.S. 7, 12–16 (1993)).

Using the Burlington-Carter framework below, I affirm the Hearing Officer's decision.

*Step One*

To properly provide a FAPE, school districts must develop an IEP that is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, 137 S. Ct. 988, 1001 (2017). The IEP is to be "constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth." Id. at 999 (citing §§ 1414(d)(1)(A)(i)(I)-(IV), (d)(3)(A)(i)-(iv)). Because school officials are responsible for critically important decisions in a disabled child's life, they are expected "to offer a cogent and responsive explanation for their decisions." Endrew F., 137 S. Ct. 988, 1002 (2017).

At step one, the Hearing Officer found Colonial did not offer E.G. a FAPE. He determined that there "was very little evidence matching LifeWorks" with E.G. and "[n]either [Colonial] nor LifeWorks could offer a comprehensive, logical explanation of how LifeWorks would address" his complex needs. Dec. at 10. The Hearing Officer did not credit testimony

6

offered by Colonial—particularly Colonial's School Psychologist, Dr. Caitlin Gilmartin, and LifeWorks' Director of Admission, Candy Cohen.[4] Id. at 7, 10.

Colonial challenges the Hearing Officer's credibility determinations by arguing he did not rely on "convincing" evidence to undermine Dr. Gilmartin's or Cohen's professional judgment. Pl. Br. at 15; see also id. at 23 ("As with so much else in his 'analysis,' the hearing officer does not explain himself further and does not address why [he found Dr. Gilmartin's] explanation 'scant' and 'not well-supported.'"), id. at 24 (Hearing Officer "only disagrees with Dr. Gilmartin's conclusion"), Pl. Opp'n Br. at 12 ("Such live testimony[-]based discretion is not an immunity from scrutiny."), id. at 14 ("The hearing officer got his deference and testimonial weighting backwards.").

I disagree. The Hearing Officer gave Dr. Gilmartin's testimony reduced weight because it was "not well-supported[] and does not withstand scrutiny." Dec. at 7.

Dr. Gilmartin concluded that LifeWorks was appropriate for E.G because "it had a trauma focus to it . . . [and] a continuum of services" available. N.T. at 32. She testified that she reviewed E.G.'s records and conducted one in-person evaluation that lasted less than two hours. Id. at 26. The records she reviewed included evaluations, observations, and recommendations from previous placements. See P-74. Some placements had worked with E.G. for more than a year. See P-74 at 3. For the most part, Dr. Gilmartin agreed with previous

---

[4] The Hearing Officer also discussed alternative reasons for finding Colonial did not offer E.G. a FAPE. See Dec. at 9 ("On paper, the District clearly offered LifeWorks. In reality, the District had not applied for [E.G.'s] admission to LifeWorks at the time LifeWorks was offered."), id. at 10 ("even if there was a perfect match between E.G.'s needs and LifeWorks' program, the District offered no plan for getting the [E.G.] to and from LifeWorks."). Because the Hearing Officer did not ultimately rely on those reasons at step one, I need not address their merits.

7

placements. She agreed that E.G. needs a well-structured and therapeutic environment, P-74 at 16–17, but disagreed that E.G. needs residential programming. N.T. at 67. Her explanation for how she reached that conclusion justifies the Hearing Officer's credibility determination.

When considering residential programming for a student, Dr. Gilmartin said she looks for "safety to self and others, you know, frequent history of elopement from the home, or the inability to get them to school in the morning." Id. The parties do not dispute, however, and E.G.'s records demonstrate, that E.G. has both a history of elopement and school aversion. See e.g., N.T. at 99 (Karen Berks, Director of Pupil Services and Special Education at Colonial: "I know that parents had expressed [elopement] as a reason they wanted a residential placement"), P-64 (absconded three times at Daniels Academy), N.T. at 755 (M.G. was forced to chase E.G. two miles down the beach while holding E.G.'s two-year old brother after he eloped on a family vacation), P-61 (E.G. was obsessed with electronics and refused to participate in behavioral or educational programs), P-94 at 2 (E.G. stated that if he went home he would "go right back to games and avoid dealing with school").

Despite the match between E.G.'s history and her own residential placement criteria, Dr. Gilmartin failed to explain how LifeWorks was equipped to handle E.G.'s needs as a nonresidential placement. She offered only her "belief," that with "supports in place," LifeWorks would be able to support E.G. N.T. at 67. Instead, she suggested that having a separate residential program on the same campus as LifeWorks, "if it were needed," demonstrates that it is suited for E.G. N.T. at 67. Colonial's offer, however, did not include access to any residential programming. E.G. was offered only LifeWorks, see P-79 at 2, which Cohen testified, does not guarantee access to different levels of care on the Foundations Behavioral Health campus: "a student does not just go from LifeWorks to a residential treatment

facility." N.T. at 502.

For a LifeWorks' student to access Foundations' residential program, a complicated multi-step process is required. First, the student needs a psychiatric evaluation, which involves them going to a different facility for an assessment because LifeWorks does not have staff psychiatrists. Id. at 503–05. If a room is not immediately available at an in-patient facility, the student is transferred to a local hospital pending assessment. Id. Meanwhile, the student is not attending school. Id. at 504–05. The Hearing Officer's determination that Dr. Gilmartin's testimony was not well-supported is justified based on this admission alone.

The Hearing Officer discredited Cohen's testimony because he determined she lacked a "clear picture of E.G.'s needs" and explained how LifeWorks matched with E.G. in only "broad generalities." Dec. at 10. I agree.

When Cohen was asked "why [she thought] LifeWorks would be appropriate for [E.G.]," her only response was:

> I can't hide my passion for this program and the tremendous amount of students we have helped emotionally, socially. It has changed kids' lives and it happens over and over again and that's why I love what I do, because it's meeting kids who have struggled in their previous placement, previous school, whatever it is, and knowing that if the student is accepted and, you know, the student and the family need to accept us know that we can help them and that's just – I'm passionate about it.

N.T. at 484–85. Cohen failed to identify any facts to illustrate how LifeWorks would address E.G.'s unique needs. See Endrew F., 137 S. Ct. at 1002.

Her later testimony suggests she had a questionable understanding of what E.G.'s unique needs were. When discussing what supports LifeWorks can offer E.G. while he is on daily bus

9

rides to the school,[5] which can exceed one hour in each direction, Cohen testified:

> So sometimes families will come in and they will be concerned about the bus ride because it's not five or 10 minutes . . . They either play video games on the bus or they go to sleep or – it has not been an issue.

N.T. at 485, see also id. at 503 ("Q: Were you aware that [E.G.] perseverates on video games? A: I *may* recall the family brought that up." (emphasis added)). It is undisputed that E.G. is obsessed with video games and that attempts to take electronics away from him can trigger significant behavioral outbursts. See e.g., P-61 at 2 (attempts to limit electronic use were met with absconding or physical violence). Cohen's recommendation demonstrates a fundamental misunderstanding of the unique issues in E.G.'s case, giving the Hearing Officer a valid reason to discredit her.

Colonial contends that Cohen's testimony about the bus ride is not an issue because she later said that LifeWorks has a no-cell-phone policy and experience transitioning students away from video games. Pl. Br. at 17. Cohen, however, never explained how LifeWorks teaches students to use electronics on a limited basis. E.G.'s perseveration confounded multiple programs for multiple years and Cohen failed to distinguish LifeWorks from any of them. See Dec. at 4. Colonial was required to present a cogent explanation of how LifeWorks' services will meet E.G.'s needs. See Endrew F., 137 S. Ct. at 1002. It failed to do so.

Further review of Cohen's testimony provides additional support for the Hearing Officer's credibility determination. The parties do not dispute that E.G.'s IEP contained a typo. Compare P-74 at 5, with P-79 at 10. It incorrectly stated that a previous evaluator had recommended day programming for E.G. See P-79 at 10. However, the evaluator's report

---

[5] A FAPE includes both "special education" and "related services," Endrew F., 137 S. Ct. at 994 (citing § 1401(9)), and "[t]he term 'related services' means transportation," § 1401(26)(A).

actually stated the opposite, that E.G. would not benefit from a day program. See P-74 at 5.
When Cohen was asked if she was aware of this error at the time she gave her recommendation, she testified that she "thought it said he could benefit from an outpatient" setting. N.T. at 498.

Colonial fails to cite, and I fail to find, any contrary nontestimonial evidence that would justify overturning the Hearing Officer's credibility determinations of Dr. Gilmartin or Cohen, or his finding that Colonial did not offer E.G. a FAPE when it recommended LifeWorks' day program. See S.H., 336 F.3d at 270.

Colonial's arguments are meritless.

*Step Two*

After the Hearing Officer determined LifeWorks was not appropriate for E.G. at step one, he considered whether Waterfall Canyon was a proper private placement. "A private placement is 'proper' if it (1) is 'appropriate,' i.e., it provides 'significant learning' and confers 'meaningful benefit,' and (2) is provided in the least restrictive educational environment." Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 276 (3d Cir. 2007) (quoting Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 248 (3d Cir. 1999)); see also Warren G. ex rel. Tom G. v. Cumberland Cty. Sch. Dist., 190 F.3d 80, 84 (3d Cir. 1999) (the "IDEA requires that disabled students be educated in the least restrictive *appropriate* educational environment . . . Thus, the test for the parents' private placement is that it is appropriate, and not that it is perfect." (original emphasis retained)).

The Hearing Officer determined that Waterfall Canyon is appropriate for E.G. because of its "structured, intensive, around-the-clock therapeutic and academic placement." Dec. at 11. He explained that it was a natural progression from previous placements because it differed "not in terms of amount of time per day that [E.G.] is in a therapeutic program, but rather" because of

11

how intense, structured, and focused it is. Id. I agree.

The Hearing Officer credited the testimony of Dr. Brandon Park, E.G.'s private neuropsychologist. Id. at 7. He found that Dr. Park's "evaluation was comprehensive and included direct observations of [E.G.]," and that his conclusions were echoed by all witnesses who had recently worked with E.G. Id. at 11. Dr. Park determined that E.G. needed residential programing because E.G.'s "Emotional Disturbance and Behavioral Struggles" are "clinically and educationally significant in the rate of occurrence (persistent) and intensity (severe)" to the point they impede E.G.'s ability to benefit from educational services. P-94 at 3. Dr. Park concluded that with intense, attentive, around-the-clock supports at Waterfall Canyon, E.G. has demonstrated success and increased academic engagement. P-94 at 1–2.

Colonial argues that Waterfall Canyon provides the same services as previous unsuccessful placements. Pl. Br. at 19. This argument ignores the Hearing Officer's findings, which show that each successive residential placement was progressively more intense. Dec. at 4–5. The findings also show that E.G. was "stabilized" at Elevations, the program he attended before Waterfall Canyon, and that E.G. progressed at Waterfall Canyon. Dec. at 5. Colonial fails to cite evidence demonstrating that Waterfall Canyon offers services identical to E.G.'s previous placements or discredit Dr. Park, who determined that E.G. was having success at Waterfall Canyon and viewed placement in a day program or outpatient therapeutic program as a long-term goal. Dec. at 5. Given the absence of contrary nontestimonial evidence that would justify overturning the Hearing Officer, I cannot overturn his factual finding that Waterfall Canyon is appropriate for E.G. See S.H., 336 F.3d at 270.

Colonial also argues Waterfall Canyon is ineligible for reimbursement under the IDEA because E.G.'s placement at Waterfall Canyon is primarily for medical, behavioral, and mental

12

health treatment. Pl. Br. at 4, Pl. Opp'n Br. at 18. It claims that Waterfall Canyon does not provide education services. Pl. Br. at 7. I disagree.

"School districts are responsible for the costs of a disabled child's placement in a residential program when that placement is 'necessary to provide special education and related services.'" Munir v. Pottsville Area Sch. Dist., 723 F.3d 423, 431 (3d Cir. 2013) (quoting 34 C.F.R. § 300.104). To determine if residential placement is necessary, the analysis must focus on whether full-time placement may be considered necessary for educational purposes "or whether the residential placement is a response to medical, social or emotional problems that are segregable from the learning process." Kruelle v. New Castle Cty. Sch. Dist., 642 F.2d 687, 693 (3d Cir. 1981). Full-time residential placement may be considered necessary for educational purposes when social, emotional, medical, and educational problems are not segregable but indiscernibly "intertwined." Id. at 693–94. "The unseverability of such needs is the very basis for holding that the services are an essential prerequisite for learning." Id. at 694.

Multiple medical professionals have concluded that E.G. needs consistent and structured programming to benefit from educational programs because of his significant maladaptive behaviors, rigidity, and obsession with electronics. See e.g., P-94 at 1 ("consistency and support from the moment he arose, until he fell asleep, with consistency across a seven-day week was required for his incremental success"). Such evidence justifies the Hearing Officer's determination that residential placement is necessary for E.G. to learn. See Kruelle, 642 F.2d at 694 ("consistency of programming and environment is critical to [the student's] ability to learn, for the absence of a structured environment contributes to [his symptoms] which, in turn, interferes fundamentally with his ability to learn").

Waterfall Canyon provides both medical and educational programs. Waterfall Canyon

13

offers special education services through Oakgrove, its on-campus school. N.T. at 382. The staff at both facilities work as one team, not two discrete entities. Id. at 400. On a typical day, E.G. participates in group therapy at the Waterfall Canyon before school. Id. at 402–03. He then attends Oakgrove from 9:45 a.m. to 3:00 p.m. Id. at 402–03. During the transition, Waterfall Canyon staff provide a morning update to the school staff. Id. at 402–03. While he is at Oakgrove, Waterfall Canyon therapists interact with and observe E.G. Id. at 330. Afterwards, he returns to Waterfall Canyon to review his school performance and participates in additional therapy programs in the evening. Id. at 402–03. E.G.'s treatment plan is updated every 90 days with input from residential and school staff. Id. at 344.

Colonial's arguments are meritless.

*Step Three*

After determining Waterfall Canyon was appropriate for E.G. at step two, the Hearing Officer considered whether he should reduce or eliminate tuition reimbursement for equitable reasons. Dec. at 12. A Hearing Officer may reduce tuition reimbursement "upon a judicial finding of unreasonableness with respect to actions taken by the parents." § 1412 (a)(10)(C)(iii)(III).

Colonial argues that tuition reimbursement for Waterfall Canyon should be reduced because M.G. and J.G. did not genuinely cooperate in the IEP process and therefore unreasonably interfered with its ability to offer E.G. a FAPE. Pl. Br. at 22.

The Hearing Officer determined the parents did not act unreasonably because they "made [E.G.] available to [Colonial] for evaluations, participated in IEP team meetings, and toured LifeWorks." Dec. at 12. I agree. Also, M.G. and J.G. authorized the disclosure of E.G.'s records to LifeWorks and took additional efforts to deliver his most recent Oakgrove education

14

plan before LifeWorks formalized its offer.  See N.T. at 91, 474.

Colonial fails to cite, and I fail to find, any contrary nontestimonial evidence that justifies overturning the Hearing Officer's decision that the parents' actions were reasonable.  See S.H., 336 F.3d at 270.  Parents advocating for their child's needs is not unreasonable by itself, rather, it is an important part of the IEP process. [6]  See Warren G., 190 F.3d at 86 ("Vigorous advocacy is an anticipated by-product of a policy encouraging parental involvement . . . The rulings in this case undermine that policy by placing parents at risk that their advocacy may be found extreme at the cost of full reimbursement." (citing Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 209 (1982))).  I defer to the Hearing Officer's finding that equities weigh in favor of reimbursement.

Colonial's argument is meritless.

An appropriate Order follows.

---

[6]     M.G.'s and J.G.'s beliefs were also based on the professional judgment of numerous educators and medical experts.  See e.g., N.T. at 562 (Dr. Christine Kodman-Jones, Psychology Instructor at Drexel University), id. at 718 (Dr. Gordon Day, Psychologist/Clinical Director at Seven Stars), id. at 635 (Dr. Brandon Park), id. at 289 (Justin Manco, Seven Stars Therapist).